h SULLIVAN, Judge.
Hank Ecroyd and Leslie Valentino Ecroyd both appeal the trial court judgment partitioning the community that formerly existed between them. We find merit to some of the contentions raised by each party, and we affirm as amended herein.
Facts
Hank and Leslie were married in Lafayette Parish on October 28, 1989. One child, Emma Yvonne, was born of the marriage. Before they married, Hank and Leslie each owned immovable property in the city of Lafayette; Leslie owned a town home on Phlox Street and Hank owned a detached dwelling on Grenada Drive. After the marriage, the couple made the Grenada Drive residence their matrimonial domicile until June 11, 1991, when they purchased a new home in Mandeville, Louisiana. Before moving to Mandeville, they sold both Lafayette properties.
hOn August 18,1992, Leslie left the matrimonial domicile in Mandeville and moved to Alexandria, Louisiana. The next day, August 19,1992, she filed for divorce in Rapides Parish. On January 26, 1994, Hank filed the instant suit to partition the community. Hank continued to live in the Mandeville home, where he was residing when the partition was tried on March 15 and 16, 1994. The parties were pronounced divorced in open court on August 30, 1993, the written judgment being signed on March 16, 1994.
The trial court took the partition suit under advisement on March 16, 1994 and rendered written reasons some fourteen months later, on May 12, 1995. After determining the value of the community and deciding the reimbursement claims of the former spouses, the trial court ordered Hank to pay Leslie a sum of $13,056.76 to equalize the interest in the community or to immediately place the Mandeville home for sale and divide the proceeds with Leslie. A written judgment in conformity with the trial comb’s reasons was signed on November 3, 1995. Both parties have appealed, Hank assigning seven errors and Leslie assigning six.
*790 The Family Home
Hank first points out two errors in the trial court’s calculation of the equity in the Mandeville home. He contends the trial court made a mathematical error and chose an incorrect figure as to the outstanding mortgage balance. We agree with Hank’s contentions.
Both parties submitted expert appraisals of the Mandeville home, with the trial court averaging the appraisals to reach a value of $195,000.00. Neither party objects to this figure. To determine the equity in the home, the trial court subtracted the outstanding mortgage balance from the value it assigned to the home. However, instead of using the stipulated balance at the time of trial, $133,181.71, the court calculated the equity based upon an updated balance of $131,916.05. This figure ^appears on an amortization table (admitted into evidence) as the balance for the month in which the trial court issued its written reasons. The court also made a subtraction error, fixing the equity at $73,361.48 rather than $63,-083.95.
La.R.S. 9:2801(4)(a) directs the trial court in a community property partition to “value the assets at the time of trial on the merits, determine the liabilities, and adjudicate the claims of the parties.” In Allen v. Allen, 602 So.2d 759 (La.App. 3 Cir.1992), we held that the trial court failed to follow § 9:2801 when it valued community assets at the time of remand from the appellate court rather than at the time of the initial trial on the merits. We stated:
The entire partition was ripe for adjudication following the trial on the merits on January 23, 1987. [Trial on remand was held on December 7, 1989.] Had the trial court initially determined the house in question was community property rather than separate, it would have then valued the community as of that date and partitioned the community in accordance with La.R.S. 9:2801.
Id. at 761.
Obviously, the trial court sought to lessen the impact of the delay between the date of trial and the date its reasons were issued. However, we find the trial court erred in relying upon the amortization table, where the record contained no evidence as to the actual balance on the date the reasons were issued. Using the balance at the time of trial, we find the community’s equity in the family home should be fixed at $61,818.29 ($195,000.00 minus $133,181.71). We note that Hank and Leslie agree that this is the correct figure.
Leslie argues that the trial court erred in awarding Hank reimbursement for one-half of the mortgage payments on the former community home that he made beyond the date of trial, in the absence of any evidence as to the amount of those payments.
La.Civ.Code art. 2365 provides in part:
If separate property of a spouse has been used to satisfy a community obligation, that spouse, upon termination of the community [4 property regime, is entitled to reimbursement for one-half of the amount or value that the property had at the time it was used. The liability of a spouse who owes reimbursement is limited to the value of his share in the community after deduction of all community obligations.
The evidence established that Hank paid a total of $24,371.02 in principal, interest, taxes, insurance, and escrow payments from the termination of the community through the date of trial, entitling him to reimbursement in the amount of $12,185.51. The trial court, however, awarded reimbursement for one-half of $37,094.56 in mortgage payments, or $18,547.28.
After taking the matter under advisement, the trial court requested additional information concerning the payments that Hank made beyond the date of trial. Hank replied in a supplemental brief that since trial he had made eight payments of $1,322.00, totaling $10,576.00. However, Hank offered no documentation in support of this statement.
In Freeman v. Freeman, 552 So.2d 636 (La.App. 2 Cir.1989), the court permitted reimbursement for mortgage payments made between the trial court’s initial judgment and an amended judgment rendered one year later, after the record had been reopened at *791 the request of the parties. The court in Freeman apparently had enough evidence to calculate the additional mortgage payments, as the amended judgment was rendered after a hearing. In the instant ease, we are unable to determine how the trial court reached the figure of $37,094.56. Perhaps the trial court relied upon both the additional information supplied by Hank as well as the amortization table in the record. However, we find that it was error to credit Hank for the additional payments in the absence of any evidence as to the amount of those payments and the source of the funds used for them. See Salsbury v. Salsbury, 27,062 (La.App. 2 Cir. 6/21/95); 658 So.2d 734 (reimbursement denied where husband produced no canceled cheeks or bank statements supporting his claim of payments, even though the parties stipulated |gas to the amount that the obligation had decreased) and Rogers v. Rogers, 94-541 (La.App. 5 Cir. 12/9/94); 649 So.2d 7 (reimbursement denied where wife failed to produce any documentation to support her testimony that she paid the house notes).
We find that Hank’s claim for reimbursement of mortgage payments, just as the equity in the home, should have been calculated upon the figures available at trial. We, therefore, amend the trial court judgment to limit Hank’s recovery for this claim to $12,-185.51 (one-half of $24,371.02).
Leslie next argues that the trial court abused its discretion in denying her claim for reimbursement of one-half the rental value of the family home while it was occupied exclusively by Hank. Leslie testified that Hank changed the locks on the home after their separation and that Hank continued to live there, in spite of her wishes that the home be sold immediately. She produced an expert appraisal fixing the rental value of the home at $1,300.00 to $1,500.00 per month.
La.R.S. 9:374(C) provides:
A spouse who uses and occupies or is awarded by the court the use and occupancy of the family residence pending either the termination of the marriage or the partition of the community property in accordance with the provisions of R.S. 9:374(A) or (B) shall not be liable to the other spouse for rental for the use and occupancy, unless otherwise agreed by the spouses or ordered by the court.
In Jones v. Jones, 605 So.2d 689 (La.App. 2 Cir.), writ denied, 607 So.2d 571 (La.1992), the court held that the legislature intended that the spouse occupying the family residence should not be hable for rent unless the trial court ordered payment of rent at the time the use and occupancy of the home was awarded. See also Bolden v. Bolden, 524 So.2d 10 (La.App. 1 Cir.1988). However, this circuit has always interpreted this statute to mean that the trial court has great discretion in awarding rent, whether at the time of the award of the use and occupancy or at the time of the partition of community property. See Rozier v. Rozier, 583 So.2d 87 (La.App. 3 Cir.1991); LeBlanc v. LeBlanc, 490 So.2d 763 (La.App. 3 Cir.), writ denied, 494 So.2d 332 (La.1986). In Herrell v. Herrell, 594 So.2d 943 (La.App. 3 Cir.1992), we held that the trial court could award rent at the time of the partition where the record was previously silent on rental payments.[1]
In the instant case, the trial court’s previous rulings on divorce and custody matters are silent as to either the use and occupancy of the home or rental payments. In denying Leslie’s claim for reimbursement of the home’s rental value, the court noted that Leslie was not forced to leave the home, that she chose not to return, and that she was not denied access to the home even though Hank changed its locks. However, in Rozier, 583 So.2d at 90, we rejected similar arguments advanced for the denial of rent:
Defendant argues that he should not be charged with rent because there was no court order awarding his exclusive use or occupancy of the home and there was no evidence presented which would indicate that plaintiff sought to live in the home or obtain the use and occupancy of it. However, we note that the statute does not *792 require an award of use and occupancy, it merely requires that the spouse use and occupy the home. Additionally, there is no requirement in the statute that the non-occupying spouse attempt to obtain the use and occupancy of the house before the spouse can be awarded rentals; again, the statute only requires that a spouse use and occupy the home.
In Richard v. Richard, 95-1536, p. 3 (La.App. 4 Cir. 2/15/96); 669 So.2d 1267, 1269, the fourth circuit reached a similar conclusion:
Whether Mr. Richard’s use of the house was to the exclusion of Mrs. Bagneris and the trial court’s ruling that he was in exclusive control were not determinative of the issue of rental reimbursement. The trial court noted in its reasons that Mr. Richard cited no case and it was unable to locate a case holding that the spouse seeking reimbursement has to show that the spouse using the home did so exclusively.
_[7_In Richard, the parties agreed that the husband would continue to occupy the home until the minor child reached eighteen. At the time of this agreement, the parties did not discuss the issue of rental reimbursement. Nonetheless, at the time of the partition some seven years later, the trial court awarded rent to the wife, and the appellate court affirmed.
When Leslie left the matrimonial domicile, she indicated her wish that the home be sold as soon as possible. She tried to put the home on the market with a real estate agent, but Hank would not sign the listing agreement. Hank testified that he believed the listing price was too high, yet he made no effort to list the house at a more reasonable price. Instead, he chose to occupy the home throughout these proceedings. Considering these circumstances, as well as the length of time between the termination of the community and the rendition of judgment, we find the trial court did abuse its discretion in denying Leslie’s claim. The trial court judgment is amended to award Leslie reimbursement of $12,350.00 for Hank’s occupancy of the home from the termination of the community through trial (one-half of $1,300.00 times nineteen months).
Leslie also contends that the trial court erred in awarding Hank the option to purchase the home "without a time period within which to exercise this option. The language in the trial court’s reasons provides:
This calculation assumes that Hank Ec-royd would keep the house. If he decides not to do so, it should be immediately placed on the market and the net proceeds should be divided equally between the parties and Hank Ecroyd should receive the reimbursement due him from Leslie Ec-royd.
This language is similar to the order in Rozier, 583 So.2d at 88, which provided:
The minute entry also provided that if the defendant decides to keep the family home, he will have to pay the plaintiff her half of the community and assume the mortgage obligation on the home. In the alternative, if defendant decides to sell the home, the community would be divided with defendant owing the community $15,000.00 in rent and the community owing him $6,388.50 in mortgage payments.
_|gWe find that such an order is within the trial court’s discretion. However, in consideration of the lengthy delay between trial and judgment, we will order that Hank either accept the allocation of the home to him, subject to the reimbursements ordered in this opinion, or place the home for sale within thirty days of this judgment becoming definitive.
Bank Accounts
These assignments of error concern the four community bank accounts that existed at the termination of the community, as well as new accounts that Leslie opened when she moved to Alexandria. The court ordered Leslie to reimburse Hank one-half the balances in two accounts that she closed, or $4,081.92, and ordered Hank to reimburse Leslie one-half the balances in the remaining two accounts or $1,997.96.
Hank argues that the trial court erred in ordering him to reimburse Leslie for one account, which had a balance of $1,277.63, because Leslie had written checks before the termination of the community that *793 depleted those funds. We find merit in this contention.
La.Civ.Code art. 2369 provides in part:
A spouse owes an accounting to the other spouse for community property under his control at the termination of the community property regime.
In Roberts v. Roberts, 542 So.2d 517 (La.App. 5 Cir.), writ denied, 547 So.2d 1317 (La.1989), the court relied upon this article in refusing to hold a spouse accountable for funds that he expended during the existence of the community. The court stated:
However, the article by its language applies to assets in existence when the community ends, it does not apply to assets used while the regime of acquets and gains is still operating.
Id. at 521.
|9In Major v. Major, 94-1885, 1886 (La.App. 4 Cir. 4/3/96); 671 So.2d 571, the court held both spouses accountable for funds in their possession at the termination of the community, in the absence of any evidence that the funds were “disposed of’ before termination.
In the instant ease, Hank has shown that Leslie spent all but $78.66 in that account before she moved to Alexandria. Leslie later closed the account by writing herself a check for this remaining balance. We find the trial court erred in holding Hank accountable for any funds in this account. Accordingly, the trial court judgment is amended to reduce the reimbursement by Hank to Leslie for funds under his control at the termination of the community from $1,997.96 to $1,359.15.
Hank next argues that the trial court erred in failing to order that Leslie reimburse him for community funds that she expended in her move to Alexandria. He contends that Leslie’s moving expenses, which he lists as apartment and utility deposits, a new washer and dryer, and $1,600.00 paid to a moving company, are separate obligations under La.Civ.Code art. 2363 for which reimbursement is owed under La.Civ. Code art. 2364. Without discussing whether these obligations are separate or community, we note that the trial court did hold Leslie accountable for these expenses. The court considered the deposits and the washer and dryer to be community assets. The court allocated these assets to Leslie, and she has not objected to this action. Additionally, Leslie testified that the $1,600.00 paid to the moving company was withdrawn from one of the two community accounts that she closed. As discussed above, the trial court ordered Leslie to reimburse Hank one-half of the balances in those accounts. We find no merit to this assignment of error.
Hank also argues that the trial court should have ordered Leslie to reimburse him for one-half of $3,600.00, which was not in any bank account, that Leslie allegedly used to open an account in Alexandria. Leslie testified that she opened an account in 11 (Alexandria with donations from her grandmother, her mother, and with money that she had been saving before she left. In support of this testimony, she introduced a copy of a check for $1,000.00 written to her by her grandmother.
La.Civ.Code art. 2340 provides that things in the possession of the spouse during the existence of the community regime are presumed to be community property, but either spouse may prove that they are separate property. We find that this presumption does not apply to any money that Leslie may have deposited in Alexandria after the termination of the community in excess of the balances in the community accounts. The trial court did not err in accepting Leslie’s testimony as to the source of any additional money that she may have had. Because Leslie accounted for the balances in all community accounts, we find no error the denial of this reimbursement claim.
Savings Bonds
Hank argues that the trial court erroneously calculated the value of savings bonds belonging to the community at $3,500.00 instead of $4,800.00. Leslie contends that the trial court erred in ordering her to reimburse Hank for one-half of $3,500.00, representing the value of the savings bonds found to be in her possession. We find merit to both arguments.
Hank and Leslie purchased a total of $4,800.00 in United States savings bonds dur *794 ing the existence of the community. They testified that the bonds were purchased solely for Emma’s education, and the bonds were registered in either Hank and Emma’s names or Leslie and Emma’s names. The former spouses testified that they would be willing to divide the bonds equally, with the stipulation that neither party cash the bonds without the other’s consent, or that Emma cash them when she turned eighteen.
InWe find that the trial court should have allocated the bonds to one or both parties as assets of the community, rather than ordering Leslie to reimburse Hank for one-half of their value. The most equitable solution for the purposes of this partition is to allocate one-half of the value of the bonds, or $2,400.00, to each party.
Commingling of Separate and Community Funds
Hank’s next assignments of error concern claims by each spouse for reimbursement of separate funds deposited into community bank accounts. Leslie sought reimbursement for one-half the proceeds from the sale of her separate town home, contending that this money went towards the purchase of the couple’s new home in Mandeville. The trial court agreed with Leslie, and Hank appeals, arguing that these funds lost their separate identity when they became commingled with community funds. Hank also sought reimbursement for income earned before the marriage but received during the existence of the community and for $5,000.00 which he gave to Leslie two days before their marriage, allegedly to be deposited in community accounts. He appeals the trial court’s denial of these two reimbursement claims.
In Curtis v. Curtis, 403 So.2d 56, 59 (La.1981) the supreme court stated:
We have stated in cases involving bank accounts that the mere mixing of separate funds and community funds in the same account does not of itself convert an entire account into community property; only when separate funds are commingled with community funds indiscriminately so that the separate funds cannot be identified or differentiated from the community funds are all the funds characterized as community funds.
On May 20, 1991, Leslie deposited the net proceeds from the sale of her town home, $23,507.24, into a community checking account. The Mandeville home was purchased on June 11,1991. During these three weeks, the balance in that account rose to $62,-872.67. After the purchase of the home, $2,231.44 remained in that account.
_]i2Át trial Leslie testified that withdrawals totaling $58,672.41 concerned the purchase of the Mandeville home. These withdrawals included $36,266.92 for the down payment, $15,230.00 for new furniture, as well as other checks for moving expenses, a fence for the new home, new cable and television connections, plumbing services for the new house, and vehicle stickers required by their new subdivision.
La.Civ.Code art. 2367 provides in part:
If separate property of a spouse has been used for the acquisition, use, improvement, or benefit of community property, that spouse upon termination of the community is entitled to one-half of the amount or value that the property had at the time it was used. The liability of the spouse who owes reimbursement is limited to the value of his share in the community after deduction of all community obligations.
(Emphasis added.)
In ruling in Leslie’s favor, the trial court stated:
The testimony of the parties clearly establishes that Leslie Eeroyd’s condo was sold on May 20, 1991, in order to facilitate the purchase of the family home in Mande-ville. ... In exhaustive trial testimony, check by check, Leslie Eeroyd conclusively proved to this court that the funds from the condo sale benefited the community, [ie.] the purchase of the Mandeville home.
After reviewing the bank records and trial testimony, we find no error in the trial court’s ruling. When questioned about the sale of Leslie’s town home, Hank testified as follows:
Q. Was the decision to put the condominium on the market — did it have any *795 thing to do with y’alls’ decision to purchase the Mandeville home?
A. Anything we sold including my house had something to do with purchasing the Mandeville home.
Q. So the decision to sell Mrs. Ecroyd’s condominium was due to the fact that /all needed to have funds to get into the Mandeville home, is that not correct?
A. And buy furniture.
| iaAlthough that account included substantial community deposits, in addition to Leslie’s separate funds, the bulk of the activity in the account during those three weeks concerned either the purchase, the furnishing, or the improvement of the new home. The other activity in the account was negligible in comparison to the transactions concerning the Mandeville property. See Rogers, 649 So.2d 7; Young v. Young, 549 So.2d 437 (La.App. 3 Cir.1989).
In support of this claim for funds brought into the marriage, Hank introduced evidence of his earnings and a savings account statement dated two months after the marriage showing a balance of over $15,000.00. Two days before the marriage he wrote a check to Leslie for $5,000.00. He testified that this money was to be placed in the community savings account. Although Hank produced the checking account statement showing the $5,000.00 withdrawal and a copy of the check written to Leslie, he could not show where the money was ultimately deposited. Without further documentation or testimony as to the use of these funds, we can find no error in the trial court’s denial of these reimbursement claims.
Valuation of Community Movables
In valuing the movable property of the community, the trial court averaged the values submitted by each party for the particular items in dispute. Leslie contends that this was error; she argues the trial court should have accepted her values because they were the only ones supported by expert testimony. We disagree.
A similar argument was rejected in Ramstack v. Krieger, 470 So.2d 162 (La.App. 4 Cir.), writ denied, 474 So.2d 1310 (La.1985), where the court held that the trial court was not required to accept the value of an asset advanced by the only expert to testify. In the instant case, many of the items valued were the new furnishings purchased approximately one year before the parties separated. The trial court knew the age of these items and was provided with photographs of them. The record |⅛ contains sufficient evidence to support the trial court’s valuation of the community movables, and we find no manifest error in the figures used by the court. See Callender v. Callender, 625 So.2d 257 (La.App. 5 Cir.1993), writ denied, 93-3080 (La.2/4/94); 633 So.2d 583.
Final Calculations
Leslie argues that the trial court made several errors in its accounting methods, including allocating assets to each party then ordering the reimbursement of one-half of those assets to the other party. We agree that the trial court’s judgment is irregular and confusing. We will, therefore, perform the final calculations of the net value of the community, the reimbursement claims discussed herein, and those reimbursement claims not contested on appeal in the form submitted by both parties in their briefs:
Assets of the Community
Equity in Mandeville home $61,818.29
Ford Tempo automobile 3,250.00
Household movables 18,468.50
Savings bonds 4,800.00
Apartment deposit 225.00
Utility deposit 100.00
$88,661.79
Each spouse’s net share
$44,330.89
*796 [[Image here]]
Assets Allocated to Hank:
Equity in home $61,818.29
Household movables 4,051.00
Ford Tempo automobile 3,250.00
½ Savings bonds 2,400.00
$71,519.29
Assets Allocated to Leslie:
Household movables $14,417.50
Utility deposit 100 .00
Apartment deposit 225.00
½ Savings bonds 2,400.00
$17,142.50
Amount Hank owes to equalize assets
($71,519.29 - $17,142.50) -h 2 $27,188.39
[[Image here]]
Leslie owes Hank:
½ Community debts paid by Hank $ 561.04*
⅛ Community payments on Leslie’s town home (principal) 7,790 .01*
½ Community funds taken by Leslie to Alexandria 4,081.92*
⅜ Mortgage payments made by Hank 12,185.51
½ Community payments on Leslie’s separate car 1,700.00*
$26,318.48
Hank owes Leslie:
½ Present value of pension fund $ 1,150.00*
⅛ Stock proceeds in Hank’s possession 4,456.53*
⅝ Community payments on Hank’s separate home (principal) 620.00*
⅛ Payoff on Hank’s separate home 735.13*
⅜ Proceeds from Leslie’s town home 11,753.62
½ Rental value of Mandeville home 12,350.00
½ Cost of psychological evaluation 175.00*
½ Community funds in Hank’s possession 1,359.15
$32,599.43
Net Reimbursement owed to Leslie $ 6,280.95
Leslie should have received her net share of the community ($44,330.89) plus the net reimbursement owed to her ($6,280.95) for a total of $50,611.84. Because assets allocated to her totaled only $17,142.50, she is entitled to receive an equalizing payment of the difference, $33,469.34. See Cutting v. Cutting, 625 So.2d 1112 (La.App. 3 Cir.1993), writ denied, 93-2770 (La.1/7/94); 631 So.2d 453.
In conclusion, the trial court judgment is amended to fix the equity in the family home at $61,818.29; to reduce Hank’s claim for reimbursement of mortgage payments through date of trial only, or $12,185.51; to award Leslie reimbursement for the rental Rvalue of the home from the termination of community through trial in the amount of $12,350.00; to order that Hank either accept the allocation of the home to him or place the home for sale within thirty days of this judgment becoming definitive; to reduce reimbursement owed by Hank for funds within his control after the termination of the community from $1,997.96 to $1,359.15; to allocate $2,400.00 in savings bonds to each party as a community asset; and to increase the equalization payment owed to Leslie from $13,056.76 to $33,469.34.
*797 Costs of this appeal are assessed to both parties.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.

. Hank relies upon the per curiam opinion of Bodenheimer v. Freitag, 94-2573 (La. 1/6/95); 651 So.2d 251, in which the supreme court reversed an award of rent in favor of the wife. Because the facts underlying that decision were not reported by either the appellate court or the supreme court, we find the per curiam opinion to be of little precedential value.

 Reimbursement claims not contested on appeal.