11 SAUNDERS, Judge.
In this malpractice action, the only issues are quantum and legal interest. Both parties contest the $425,000.00 general damages awarded for a minor decedent’s conscious pain and suffering, and for the mother’s grief, loss of love, affection and consortium. Finally, defendant complains of the assessment of pre-judgment legal interest on the $100,000.00 previously tendered by the tort-feasor. We reverse the contested legal interest award and otherwise affirm.
1 -¿FACTS
The facts leading to this controversy are largely undisputed. This malpractice suit against Dr. Charles R. Attwood and American Legion Hospital was initially filed by appellee, Wanda Futch, seeking damages for the wrongful death and survival action arising from allegedly negligent medical care rendered the decedent, plaintiff’s minor daughter, Lauren Futch. Dr. Attwood, a Crowley pediatrician, had treated Lauren for her diabetes from the time that he first diagnosed it in February 1988, when Lauren was two and a half years old, to when on or about February 29, 1990, some two years later, Lauren died from complications arising from her diabetic Condition-
Following trial on the merits on April 16, 1996, the trial court allocated general damages as follows:
(1) Conscious pain and suffering of Lauren Futch $ 98,000.00
(2) Loss of love, affection and consortium suffered by Wanda Futch $163,500.00
(3) Past, present and future grief and mental anguish suffered by Wanda Futch $163,500.00
Additionally, the trial court granted legal interest on the entire award, including $100,-000.00 that had been tendered previously by Dr. Attwood’s insurer, Insurance Corporation of America, in exchange for which plaintiff dismissed all claims against the hospital in pursuit of her remaining claims for damages only against the Louisiana Patient’s Compensation Fund.
Liability having been conceded, quantum is the only viable issue before us. While Lauren’s survivors argue that more relief is required to make them whole for their and Lauren’s suffering, defendants contend that the trial court’s awards ^constituted an abuse of discretion. Additionally, defendants suggest that the trial court erroneously charged legal interest on sums tendered in settlement prior to trial.

APPELLATE REVIEW OF DAMAGE AWARDS

In Reck v. Stevens, 373 So.2d 498 (La.1979), the supreme court commented upon the appellate review of general damage awards and on the much discretion allotted trial courts. The rule of Reck was perpetuated in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994):
In Reck v. Stevens, 373 So.2d 498 (La.1979), this Court commented on appellate review of general damage awards and on the “much discretion” in fixing damages accorded to trial courts by La.Civ.Code art. 1934(3)(1870). The decision pointed out that the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the ease under consideration.
In Reck, this court disapproved the appellate court’s simply reviewing the medi *960 cal evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular ease. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the “much discretion” of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La.1974).
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance |4as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is “great,” and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Youn, 623 So.2d at 1260-61.[1]
Initially, defendant complains that the award of $98,000.00 for young Lauren’s conscious pain and suffering is excessive, given that she had been consciously ill for only thirty-six hours or so before lapsing into a coma and during that time apparently did not suffer from any extraordinary degree of pain or discomfort, particularly during the period for which the Phenergan offered her some relief.
Plaintiff opposes this suggestion and notes that young Lauren had endured complications, suffering all the while, worsening over a sixty-two hour period and ultimately resulting in her death. In support of her position, plaintiff highlights certain entries contained in the American Legion Hospital’s charts which clearly evidence a continuous decline in the young girl’s condition, much of which could have led the trial court to have determined that the young girl was aware of .her discomforts.[2]
Given the evidence presented, we are not in a position to second guess the findings of the trial court who may well have determined, contrary to defendant’s ^assertions, that Lauren had in fact endured extraordinary pain, discomfort and emotional trauma.
Likewise, we find no abuse of discretion on the part of the trial court’s magnitude of relief. Defendant, in brief, concededly did not contend that the mother did not have a close and loving relationship with her daughter, but nonetheless would have us reduce *961 this sum, apparently on the following bases: she was only fifteen years old when she gave birth to Lauren on January 22, 1986; Lauren’s father was not married to Ms. Futch and did not enjoy a close relationship with their daughter nor contribute to her support or make a claim for damages in these proceedings; Ms. Futch has since had another child and has only received counseling from a health care professional on two occasions, possibly in part due to problems arising in her own childhood.
We conclude that none of these factors, with the possible exception of the last, could be construed to justify a reduction in the trial court’s award and that some and additional others, including the mother’s tender age, personal background, and marital status would seem to suggest to us (as they did to the trial court) that plaintiff, Wanda Futch, was particularly close to her daughter and vulnerable.
The record simply denies us the means to conclude that the trial court abused its much discretion either as to the child’s or the mother’s suffering.
What the record shows is that the baby was born and lived for two years in Monroe, where Wanda’s father assisted in caring for it, until Wanda moved to Crowley soon before the child’s diabetes became known. Soon after the February 1988 diagnosis, Lauren received medical treatment in New Orleans, where her mother Wanda simultaneously received training for the care and management of her diabetic Lchild. According to plaintiff, Wanda was taught that even simple symptoms, such as a cold or nausea, could cause or lead to grave consequences due to diabetes.
On the morning of February 28, 1990, a nauseated Lauren awoke her mother. She had vomited two or three times before 7:00 a.m. and her glueose/blood sugar reading was high. Wanda administered her daughter’s morning insulin injection and intended to feed her child a light breakfast before bringing Lauren to see Dr. Attwood at about 9:45 a.m. According to plaintiff, Dr. Attwood, having initially diagnosed Lauren as diabetic two years prior, did not check Lauren’s blood sugar or her urine to determine whether or not ketones were present, but had he done so, young Lauren’s condition could have been quickly corrected by the simple administration of insulin. Instead of administering insulin, however, Dr. Attwood prescribed the use of Phenergan suppositories to address Lauren’s symptoms.
As instructed, Wanda administered the medication at approximately 11:00 a.m. before returning to school. (Mother Wanda was only fifteen years old when daughter Lauren was bom and sought to improve through education her and her child’s lot in life.) Lauren left the child with her grandmother, but when she called home to learn of her baby’s condition, was informed that Lauren had vomited once since 11:00 a.m. and was presently sleeping. When Wanda returned home from school at approximately 4:00 p.m., she woke up her daughter and found her weak and tired, just wanting to be permitted to sleep. When her daughter vomited again, Wanda unsuccessfully attempted to reach Dr. Attwood by telephone and eventually brought Lauren to the American Legion Hospital emergency room at approximately 6:50 p.m. on February 28, 1990, when Lauren’s temperature was 94.6 degrees. Hospital personnel eventually contacted Dr. Attwood at approximately 7:40 p.m. When Dr. Attwood returned the call, he again prescribed a Phenergan injection. Plaintiff 17observes that Dr. Attwood did not go to the hospital and had not been given Lauren’s vital signs when he suggested such an injection, and further failed to order any blood or urine tests.
Wanda returned home at approximately 8:00 p.m. that evening with Lauren and went to bed, waking around midnight to administer the prescribed medication, whereupon she found Lauren sleeping but breathing through her mouth rather than her nose. The child woke, but went right back to sleep.
Early on the morning of February 29, 1990, Wanda awoke and found Lauren with labored breathing. Attempting to wake up the four year old, her only responses, according to plaintiffs brief, were “Huh” followed by moaning. Wanda telephoned Dr. Attwood and informed him of her daughter’s far-wors *962 ened condition and Dr. Attwood admitted Lanren to the American Legion Hospital at 6:30 a.m. that morning. Hospital records revealed Lauren’s being “acutely ill” at the time of admission, her glucose level raised to 507 with her blood acid revealing diabetic ketoacidosis. At approximately 9:13 a.m., Lauren went into respiratory arrest as a result of her brain swelling and rupturing into the opening at the base of her neck. Lauren was immediately transported by helicopter to Children’s Hospital in New Orleans and diagnosed with ketoacidotic coma, cerebral edema (swelling of the brain), bilateral pulmonary edema (swelling of both lungs), and was pronounced dead at 5:07 p.m. on March 2,1990.
Although Wanda was fortunate in having her family’s assistance with caring for her baby — by her father and sister in Monroe and by her mother in Crowley while Wanda attended school in Lafayette — she was unquestionably the child’s principal care giver, checking Lauren’s blood sugar and administering Lauren’s insulin injections. Wanda was more than her baby’s care giver. She was Lauren’s devoted_[sloving mother and friend. The record shows that during Lauren’s short life, she and her mother were virtually inseparable literally twenty-four hours a day, except when Wanda was at school. The two arose to have breakfast together, played together and watched movies together. They even slept in the same bed.
All of this changed in Lauren’s last few days when, Lauren’s condition worsening, the child was rushed to New Orleans by helicopter without her mother, and her mother was compelled to make the journey to New Orleans apart from her ebbing daughter. During Lauren’s two and a half days of illness, every moment seemed worse than its predecessor. First, the mother had to witness her daughter’s decline in health in Crowley. Next, she had to drive to New Orleans, where her protracted wait was punctuated only by various traumatic episodes, including Lauren’s respiratory intubation, then by her respiratory failure and consequent “code blue,” complete with the scurrying in and out of numerous medical staff to see Lauren behind doors closed to Wanda and, finally, Wanda’s being asked to consider whether she would prefer to “pull the plug” on her daughter or to watch her linger indefinitely.
Confronted with this dilemma, the young mother opted not to punish her daughter with more torment. She decided to let her go, and did.
At this juncture, regrettably only baby Lauren was released from her anguish. Not so for Wanda, whose lot in many ways has only worsened. For Wanda, the period following Lauren’s death has been marked by the inevitable sense of loss of one who had since her coming to this world been virtually joined at her mother’s hip, and by the guilt of one whose unrelenting loss always compels her to ask what she might have done differently to have saved her budding child’s life.
In view of these facts, we cannot say that the trial court erred in concluding what sum was fair to both parties, and finding no such abuse of discretion, we affirm 19the substantive monetary judgments rendered by the trial court compensating Lauren and Wanda for their respective losses.

LEGAL INTEREST

Finally, we turn to the last question presented by this controversy, whether the trial court erroneously assessed the patients compensation fund with interest on the entire quantum award, including interest on the $100,000.00 sums tendered prior to trial by the qualified health care providers.

Prior Jurisprudence

The question of whether the patient’s compensation fund is to be assessed with interest on the entire sum as opposed to being charged with interest on only its own share of the principal has been addressed in two reported cases to date. Both concluded that the Fund owed interest on the greater amount. The first ease, Castillo v. Monte-lepre, 999 F.2d 931 (5th Cir.1993), before reaching its conclusion, noted that the Louisiana statutes most likely to resolve the dispute were susceptible of either interpretation:
*963 Section 40:1299.42(B)(1) indicates that the total amount a malpractice victim can recover from the Fund, exclusive of future medical care and related benefits, “shall not exceed Five Hundred Thousand Dollars plus interests and cost.” (emphasis added). Section 40:1299.42(D)(5) provides for the Fund to receive a credit “in the amount of malpractice liability insurance in force as provided for in La.R.S. 40:1299.42(B)(2)” once a victim settles with a provider and continues its action against the Fund, (footnote omitted). Section 40:1299.42(B)(2) indicates that a qualified provider “is not liable for an amount in excess of One Hundred Thousand Dollars plus interest thereon accruing after April 1, 1991, for all malpractice claims ...” (Emphasis added).
Whether the Fund may properly be held hable for interest accruing on the entire $500,000 depends upon the interpretation applied to subsections (D)(5) and (B)(2). There are at least two possible interpretations of these subsections. Under the first, (D)(5)’s reference to “the amount of malpractice liability insurance in force as provided for in [ (B)(2) ]” could be read to mean that the Fund receives a credit in an amount equal to only the $100,000 liability insurance limits which | ^providers are required to maintain under the act. Under this interpretation, the Fund would not receive credit for any interest on the $100,-000 as provided in subsection (B)(2). Thus, the Fund would be hable for interest on the total $500,000 award.
A second interpretation could read (D)(5)’s reference to (B)(2) to mean that the Fund should receive a credit in an amount equal to not only the $100,000 insurance limits, but also the “interest thereon accruing after April 1,1991.”
Castillo, 999 F.2d at 940.
Ultimately, the panel sitting in diversity concluded that, under the circumstances presented by that case, legal interest was due on the entire damages award ($500,000.00), but only because the health providers in Castillo, 999 F.2d 931, had tendered the sums they owed on March 27, 1991, that is, before the April 1, 1991, date by which interest would have begun to accrue. See La.R.S. 40:1299.42(B)(2), supra. Significantly, the court dechned to reach the question of which interpretation more accurately reflected Louisiana law, concluding that due to the date of the tender, the larger figure would have been due regardless of which approach had been contemplated by the legislature. As the Court observed:
[A]pplying this interpretation to the facts here would not change the result reached by the first interpretation. Dr. Oms and Montelepre settled with the Castillos on March 27, 1991, five days before the April 1st date upon which interest would have begun to accrue. Thus, there was no interest in existence for which the Fund could have received a credit.
Castillo, 999 F.2d, at 940.
The only other reported case that addresses this issue is Harden v. Southern Baptist Hosp., 94-2228, 94-2229 (La.App. 4 Cir. 10/12/95), 663 So.2d 443, writ denied, 95-2751 (La.1/26/96), 666 So.2d 676, which also awarded interest on the larger figure, relying on the authority of the U.S. Fifth Circuit’s Castillo opinion:
LSA-R.S. 40:1299.47 provides that legal interest shall accrue from the date of filing the complaint with the LPCF Oversight Board. LSA-R.S. 40:1299.42(B) provides that the $500,000 cap on medical 1 umalpractice recovery excludes interest and costs. Although no Louisiana case has addressed the reconciliation of these principles, the federal Fifth Circuit Court of Appeal in Castillo v. Montelepre, Inc., 999 F.2d 931 (5th Cir.1993) allowed recovery of interest on the entire $500,000 malpractice judgment although the plaintiff had settled his claim against the doctors for $100,000. We agree with the reasoning applied in that case and amend the judgment to include interest on the entire $500,000 award.
Harden, at 14-15, 663 So.2d at 452.
Although like Castillo, the court in Harden did not express its view as to which of the two alternate means of construction suggested by Castillo was preferable, it may be inferred that it chose the former, as at least one of the medical providers was dismissed *964 February 21, 1992, that is, after the April 1, 1991, date found telling in Castillo.

OUR OPINION

We read the law differently than both Castillo and Harden. While if forced to choose between the two alternatives presented in Castillo, unlike the Fourth Circuit in Harden, we would have to say that the second Castillo alternative better reflects the intent of the legislature than the first, we believe that neither Castillo alternative accurately depicts the laws of this state.
At this juncture, closer scrutiny of La.R.S. 40:1299.42’s pertinent provisions might prove useful:
B. (1) The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost.
(2) A health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon accruing after April 1, 1991, for all malpractice claims because of injuries to or death of any one' patient. ’
[[Image here]]
| i2D.(5) In the event that a partial settlement is executed between the defendant and/or his insurer with a plaintiff for the sum of one hundred thousand dollars or less, written notice of such settlement shall be sent to the board. Such settlement shall not bar the continuation of the action against the patient’s compensation fund for excess sums in which event the court shall reduce any judgment to the plaintiff in the amount of malpractice liability insurance in force as provided for in R.S. jO:m942(B)(2).
(Emphasis added; note omitted).
As noted elsewhere, the language quoted above was found to have been controlling in Castillo. The emphasized language in La. R.S. 40:1299.42(B)(2) providing for legal interest accruing after April 1, 1991, was inserted by the 1990 amendment, and the emphasized language affording the credit contained in (D)(5) was inserted by amendment in 1986.
Contrary to both Castillo and Harden, we conclude that neither (B)(2) nor (D)(5) is dispositive. The 1990 amendment affecting (B)(2) did only what it had purported to do, provide for the accrual of legal interest after July 1, 1991. We do not find that the amending language in (B)(2) was intended to have legal interest continue to accrue on sums that have already been paid.
Likewise, we do not agree that the language contained in La.R.S. 40:1299.42(D)(5) providing a credit for sums tendered was somehow intended to entitle a malpractice plaintiff to interest on sums already tendered; to the contrary, we find it more likely that by inserting the language in 1986, the legislature merely sought to clarify that following such partial settlements, the plaintiff may proceed against the fund, but subject to a credit equal to any amounts already tendered for the same delict.
In other, words, by inserting the statutory language, we believe that the legislature intended in medical malpractice cases no departure from the usual rule thatjfyegal interest does not continue to accrue beyond the date of unconditioned tender.[3] The rationale behind the rule, of course, is simple: legal interest is intended to compensate ultimately victorious litigants for the time value (interest) of money of which they have been deprived, and the need for such equitable relief vanishes upon the unconditional tender of such funds.
We believe that such a view not only does not run afoul of this State’s medical malpractice act but makes more sense than the contrary view, which not only would remove any *965 incentive for a sued party to settle, but would unjustly enrich medical malpractice plaintiffs by awarding them double [4] interest on money they have received.
Accordingly, for the reasons stated, we conclude that the Louisiana Patient’s Compensation Fund is not liable for interest accruing on liquidated damages that are the responsibility of licensed providers beyond the date of their unconditional tender.

DECREE

For the foregoing reasons, the judgment of the trial court is affirmed in part, reversed in part, and rendered, at defendant’s costs.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.

. This is not to say, and should not be intended to mean, that appellate courts relinquish their constitutional obligation to review contested issues of fact, including those pertaining to quantum. See, e.g., Ambrose v. N.O. Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216.

. It should suffice to say that after Lauren was admitted into the Crowley hospital conscious, her condition deteriorated, as evidence by grunting respiration, splotched leg and later facial features and occasional moaning.

. See, e.g., LaGraize v. Bickham, 391 So.2d 1185 (La.App. 4 Cir.1980), followed by Green v. Industrial Helicopters, Inc., 593 So.2d 634 n. 11 (La.1992); Green v. Industrial Helicopters, Inc., 560 So.2d 684 (La.App. 3 Cir.1990), cert. denied, 506 U.S. 819, 113 S.Ct. 65, 121 L.Ed.2d 32 (1992); and Gagnet v. Zummo, 487 So.2d 721 (La.App. 5 Cir.1986). In view of the compelling reasons stated — unjust enrichment and judicial economy — we find it immaterial that these cases involved a tender of funds by the same party who would later seek a credit.

. Presumably, the recipient of the unconditionally tendered funds will invest them and earn interest; at least by the very nature of their unconditional tender, the recipient is free to do so.