831 So.2d 1010 (2002)
Barbara HALL, et ux.
v.
BROOKSHIRE BROTHERS, LTD., Louisiana Patient's Compensation Fund.
No. 01-1506.
Court of Appeal of Louisiana, Third Circuit.
August 21, 2002.
Writ Granted November 27, 2002.
*1014 M. Keith Prudhomme, Woodley, Williams, Boudreau, Norman, Brown & Doyle, L.L.C., Lake Charles, LA, for Defendant/Appellant The Louisiana Patient's Compensation Fund.
Luke Edwards, Lafayette, LA, for Plaintiffs/Appellees Barbara Hall and Dennis Hall.
Court composed of NED E. DOUCET, JR., Chief Judge, ULYSSES GENE THIBODEAUX and MICHAEL G. SULLIVAN, Judges.
SULLIVAN, Judge.
After developing an infection that produced several boils on her body, Barbara Hall was treated by Drs. A. Kent Seale and Walter Ledet at the Sulphur Surgical Clinic (hereinafter "Clinic"). Dr. Seale issued Mrs. Hall a prescription for Gentamicin, which was overfilled by a pharmacist, Alan L. Vines, at Brookshire Brothers, Ltd. After Mrs. Hall developed vestibular dysfunction as a result of Gentamicin ototoxicity, she and her husband instituted this medical malpractice suit. The Halls settled with Dr. Seale for $100,000.00. The Halls dismissed Dr. Ledet and the Clinic and reached a settlement with Mr. Vines and Brookshire. At trial against the Patient's Compensation Fund (hereinafter "Fund"), the jury awarded total damages of $5,744,920.43 and found Dr. Seale 85% at fault, Mr. Vines 10% at fault, and Mrs. Hall 5% at fault. The judgment, after being reduced to comply with recovery limits under the Medical Malpractice Act, was for the full sum of $429,963.72, together with legal interest. The judgment also recognized Mrs. Hall as a patient in need of future medical care and related benefits in accordance with La.R.S. 40:1299.43. Both parties appeal.

*1015 ISSUES

Raised by The Fund
(1) whether a jury venire of only 120 persons who were present and competent to serve was sufficient for a trial by a fair cross-section of the community;
(2) whether the trial court's failure to strike a potential juror for cause was an abuse of discretion;
(3) whether the testimony of ENT specialist Dr. Hillary Brodie was cumulative and/or irrelevant;
(4) whether the 10% apportionment of fault to Mr. Vines and the 5% apportionment of fault to Mrs. Hall was clearly wrong;
(5) whether the Halls met their burden of proving damages in excess of $100,000.00 and whether the amount of damages awarded was excessive;
(6) whether the allocation of fault should have been applied to the amounts recoverable from the Fund rather than to the full amount awarded by the jury;
(7) whether the testimony of defense expert Dr. William Fann was properly excluded;
(8) whether Mrs. Hall's testimony regarding Dr. Seale's fault was irrelevant and unduly prejudicial to the defense; and
(9) whether the Halls are entitled to damages for frivolous appeal.
Raised by the Halls
(1) whether the jury should have been permitted to allocate fault to Mrs. Hall and Mr. Vines, given that Dr. Seale, a qualified health care provider, had previously tendered $100,000.00 in settlement pursuant to La.R.S. 40:1299.44(C)(5) and, if so, whether the evidence supports the percentages of fault allocated to Mrs. Hall and Mr. Vines;
(2) whether Mrs. Hall's recovery for past medical expenses was erroneously reduced;
(3) whether the judgment erroneously failed to award judicial interest on the entire quantum amount;
The issues of both parties shall be considered in conjunction with one another.

FACTS AND PROCEDURAL HISTORY
In March 1994, Mrs. Hall developed an infection that manifested itself through the development of boils about her body. Over the course of fifteen months, at various emergency rooms and from various doctors, Mrs. Hall sought treatment for both the boils and the medical concerns associated with them. Each time she sought treatment for a boil, the treating physician would typically lance it, drain it, and administer a course of antibiotics.
On June 26, 1995, Mrs. Hall visited Dr. Seale at the Clinic with an active abscess on her right arm. Dr. Seale recommended incising and draining the abscess with an accompanying course of oral antibiotics. Because Mrs. Hall had enjoyed only limited success with such treatment in the past, she indicated that she did not wish to be treated again in that manner. Dr. Seale explained that IV antibiotics would be an effective alternative therapy.
The next day, Mrs. Hall went to West Calcasieu Cameron Hospital, where the Clinic's Dr. Ledet drained the boil. He gathered a specimen and ordered routine cultures and susceptibility studies. The pathology report revealed a Staphylococcus aureus infection, which could be cured by the use of any one of twenty antibiotics, including Gentamicin. Mrs. Hall signed a surgical consent form for the insertion of a *1016 subclavian catheter before Dr. Ledet inserted it into her chest. A dose of 240mg Gentamicin was then administered.
On June 28, 1995, Mrs. Hall received a second dose of Gentamicin at the Clinic. Dr. Seale issued a prescription to her for Gentamicin 240mg to be self-administered once daily for three weeks, with weekly BUN (blood urea nitrogen) and creatinine tests ordered and with instructions to return for a follow-up. Mrs. Hall then took the prescription to Brookshire Brothers to have it filled. Because Mr. Vines, the pharmacist, had no Gentamicin in stock at that time, he asked Mrs. Hall to return the following day.
When Mrs. Hall returned, Mr. Vines overfilled her prescription, giving her 8,000mg of Gentamicin, when the prescription was for 5,040mg (to be administered over 21 days). Additionally, Mr. Vines allegedly failed to provide her with drug information sheets or oral instructions relative to Gentamicin.
Beginning June 29 through July 6, Mrs. Hall administered Gentamicin to herself through the subclavian catheter. On July 7, both the BUN and creatinine analyses were normal, and the eleventh dose of Gentamicin was administered. From July 8 to July 18, Mrs. Hall continued to self-administer the daily doses. The BUN and creatinine analyses of July 18 were both normal once again. Though the treatment should have ended here, Mrs. Hall administered approximately seven additional doses of Gentamicin from July 19 to July 25.
On July 25, Mrs. Hall contacted the Clinic to ask whether her medication was somehow linked to the dizziness she had been experiencing for three or four days. The next day, Dr. Ledet discontinued the Gentamicin, but continued Bactroban and Duricef. He also removed the subclavian catheter and advised Mrs. Hall to return in one month.
On August 4, Mrs. Hall called the Clinic to report that she was absolutely no better and that something had to be done. Three days later, on referral from Dr. Ledet, she saw Dr. R. Mark Williams, an ear, nose, and throat (ENT) specialist. Mrs. Hall complained of dizziness, nausea, and feeling intoxicated, although she reported no complaints of hearing loss and no ringing in the ears. Dr. Williams suspected that her vertigo could be due to Gentamicin ototoxicity. He recommended further evaluation with an ENG (electronystagmogram), Phenergan for nausea, and a referral to a neurologist. Mrs. Hall later called Dr. Williams, expressing a desire to cease further testing in hopes that her physical symptoms would remedy themselves.
On August 11, Mrs. Hall failed to keep an appointment at the Clinic. Five days later, Mrs. Hall told Clinic personnel that she was feeling better and was continuing to take Phenergan for nausea. She was not taking the Antivert, and explained that if she needed anything, she would see Dr. Bob Gordon. On August 23, Mrs. Hall again failed to keep an appointment at the Clinic.
On October 10, Mrs. Hall indicated that she was to see Dr. Newton Coker. She said she would call back with results from that visit, but when the Clinic attempted to contact Mrs. Hall on October 31, her phone had been disconnected.
In late November, Mrs. Hall saw Dr. Melton Horowitz, an ENT specialist in Houston. Dr. Horowitz testified that Mrs. Hall suffered from vestibular dysfunction sustained through Gentamicin ototoxicity. He noted that her condition was a permanent disability. Dr. Hillary Brodie, Department of Otolaryngology Chair at the University of California Davis, saw Mrs. Hall and determined that she suffered from *1017 severe bilateral vestibular injuries secondary to Gentamicin ototoxicity. Dr. Brodie indicated that there is no medical treatment for Mrs. Hall's condition.
On July 29, 1996, Mr. and Mrs. Hall sued Brookshire, Mr. Vines, and the Sulphur Surgical Clinic. The petition was eventually amended to include Drs. Ledet and Seale. The medical review panel, consisting of three general surgeons, found that Brookshire and Mr. Vines were not fund-qualified and made no determination regarding the overfilling of Mrs. Hall's prescription. The panel unanimously found that Dr. Seale deviated from the applicable standard of care, although it concluded that Dr. Ledet did not. The panel was unsure of whether Dr. Seale's actions caused any vestibular damage after September 1996.
On June 2, 2000, the trial court signed a judgment, approving a settlement between the Halls and Dr. Seale for $100,000.00, with reservation of rights against the Oversight Board, in accord with La.R.S. 40:1299.44(C). The judgment was also signed "recognizing and establishing the liability of defendant, Dr. A. Kent Seale, as admitted, as provided by LSA-R.S. 40:1299.44(C)(5)." At this time, the Halls agreed to dismiss Dr. Ledet and the Clinic without prejudice. The Fund filed a cross-claim against Mr. Vines, Brookshire, and National Union Fire Insurance Company of Pittsburgh, Pennsylvania, claiming entitlement to indemnity and/or contribution from these parties in the event that the Halls proved entitlement to judgment against the Fund.
Plaintiffs and Defendants filed reciprocal Motions for Partial Summary Judgment with respect to the liability of Mr. Vines and Brookshire Brothers. When the Halls eventually reached a settlement agreement with the pharmaceutical defendants, they withdrew their motion. When the Fund re-urged its motion, the trial court granted it in part, establishing that Mr. Vines was employed by Brookshire and that he breached the standard required of him. However, the extent of damage and causation were to be determined at trial on the merits.
In early December 2000, Mr. and Mrs. Hall filed a pre-trial Motion to Strike and/or Motion for Partial Summary Judgment, asserting that their $100,000.00 settlement with Dr. Seale amounted to an admission of liability. As such, the Fund should be precluded from contesting matters other than damages and certain defenses raised in the Fund's objections to the Joint Petition for Settlement of a Medical Malpractice Claim. The Halls argued further that partial summary judgment on liability should be entered against the Fund, since there was no longer a genuine factual dispute that damages exceeded $100,000.00. After the trial court ruled that the Fund would not be allowed to proceed with a comparative fault argument, the Fund filed a writ application with this court. We granted the Fund's application and reversed the trial court's ruling.
The Halls filed a Motion in Limine to exclude the testimony of the Fund's expert, Dr. William Fann, based on its failure to timely disclose his identity. The trial court first ruled that, due to insufficient notice regarding the time limit for submission of witness lists, the parties would not be responsible for failing to submit the lists in a timely manner. The trial court then stated that it would allow the testimony of Dr. Fann under the following conditions: (1) Dr. Fann will be available for deposition between June 15, 2001 and the time of trial; (2) the Defendants pay 50% of the court costs for this matter; and (3) non-compliance would result in the exclusion of Dr. Fann's testimony. *1018 On the day of trial, the Halls filed a Daubert exception, again attempting to prohibit the testimony of Dr. Fann. The trial court deferred ruling until Dr. Fann would be available to the court for questioning outside the presence of the jury. After a Daubert hearing, the trial court did not permit Dr. Fann to testify. The Fund then to objected both Drs. Brodie and Horowitz testifying, arguing that their testimony would be cumulative, repetitive, and prejudicial. The trial court overruled this objection.
On June 28, 2001, the jury returned a verdict finding Dr. Seale 85%, Mr. Vines 10%, and Mrs. Hall 5% at fault. The jury awarded $1,000,000.00 for physical and mental pain and suffering and loss of enjoyment of life (past and future); $500,000.00 for permanent or partial physical disability (past and future); $146,834.00 for loss of earning capacity; and $35,251.43 for past medical expenses. The jury also found that Mrs. Hall was in need of future medical care in the amount of $3,862,835.00. Mr. Hall was awarded $200,000.00 for his loss of consortium.
Some months later, a dispute arose with respect to the application of the percentages of fault. After a hearing on August 23, 2001, the trial court signed a judgment for the full sum of $429,963.72, pursuant to the limitation of La.R.S. 40:1299.42(B) and reflecting a reduction of 15% in accordance with La.Civ.Code art. 2323, together with legal interest thereon from May 31, 1996 until paid. The judgment also reflected the jury's finding that Mrs. Hall was a patient in need of future medical care and related benefits in accordance with La.R.S. 40:1299.43.

LAW AND DISCUSSION

Sufficiency of the Jury Venire
The general venire in civil cases is governed by the Louisiana Code of Criminal Procedure. La.R.S. 13:3044. In parishes other than Orleans, the jury commission must impartially select at least 300 qualified people to populate the general venire. La.Code Crim.P. art. 408(A). The Fund asserts that of the nearly 298 potential jurors who comprised the venire, only 120 were present and qualified to serve. The Fund claims that, as a result of this limited venire, it was denied a trial by fair cross-section of the community.
The Fund directs attention to La. Code Crim.P. art. 409.3, allowing for a district court's creation and administration of a central jury pool. The Fund points specifically to Subsection (D), which explains in part that "[t]he number of persons selected to comprise the panel shall be determined pursuant to local court rules but the number shall be no less than three times the number of persons needed to complete the jury and in no event less than ten." Because only thirty perspective jurors were sent to the courtroom for empaneling, the Fund argues that this lack of potential jurors further deprived it of trial by a fair cross-section of the community.
Even if the requirements of La.Code Crim.P. arts. 408(A) and 409.3 were not strictly adhered to, we cannot ignore the following mandates. Under La.R.S. 13:3051, the "general venire ... shall not be set aside for any reason unless fraud has been practiced or some great wrong committed that would work irreparable injury." Moreover, "[a]ll objections to the manner of selecting or drawing the jury or to any defect or irregularity that can be pleaded against any array or venire must be urged before entering on the trial of the case; otherwise, all such objections shall be considered as waived and shall not afterwards be urged or heard." La.R.S. 13:3052.
*1019 Because the Fund failed to lodge a contemporaneous objection to the number of persons on the venire before trial, this issue was not properly preserved for appeal. Even if a contemporaneous objection had been urged, however, the Fund has not presented specific evidence of fraud or some great wrong resulting in irreparable injury. The Fund has failed to prove that the general venire (or panel) from which the jurors were selected did not represent a fair cross-section of the community or that the jurors who were ultimately selected did not represent a fair cross-section.

Unwillingness to Strike Prospective Juror for Cause
"When the juror lacks a qualification required by law" or "[w]hen the juror has formed an opinion in the case or is not otherwise impartial, the cause of his bias being immaterial," he may be challenged for cause. La.Code Civ.P. art. 1765(1) and (2). In civil cases, criminal jurisprudence on challenges for cause of prospective jurors may be considered. Smith v. Flotation Servs., Inc., 596 So.2d 343 (La.App. 3 Cir.1992). As such, we turn to State v. Ball, 00-2277 (La.1/25/02); 824 So.2d 1089, which sets out the standard of review on this matter. The trial judge is afforded broad discretion when ruling on challenges for cause. His rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. When he erroneously denies a challenge for cause and the defendant ultimately exhausts his peremptory challenges, prejudice is presumed. And when the erroneous ruling denies the defendant a peremptory challenge, this constitutes reversible error.
Prospective juror Mr. Rogers indicated that he was involved in an ongoing automobile accident lawsuit. He explained that, as a result of the accident, he underwent cervical surgery, which made it impossible for him to remain seated in the same position all day. He also stated that he was taking nerve medication that dulled his senses. The Fund successfully challenged Mr. Rogers for cause.
Particularly, the Fund alleges that the trial court refused to grant its challenge for cause with respect to prospective juror Mr. Bias, who had his right leg amputated years ago, suffered a stroke in 1999, and had recently been involved in an automobile accident. He believed that his stroke was caused by anesthesia administered by a dentist, but he has not filed a medical malpractice suit.
Because Mr. Bias has no blood flow to one side of his brain, he expressed concern about being able to remember events from earlier in the day. However, when questioned by the trial court, Mr. Bias indicated that he was able to write and that being able to take notes would stimulate his memory. Observing that note-taking was not a ground for a challenge for cause, the trial court stated that Mr. Bias "has convinced the Court that he does [possess the qualifications of a juror] and that the notes would help him with the problem he has." The trial court then advised the Fund that it could further develop its challenge for cause, but the Fund challenged Mr. Bias peremptorily without further questioning.
The Fund argues that the denial of the challenge for cause was an abuse of discretion in light of the insufficient jury venire and the other successful challenges for cause. Additionally, the Fund argues that having to peremptorily strike Mr. Bias contributed to the exhaustion of its peremptory challenges. We find no merit to these arguments. Pursuant to La.Code Civ.P. art. 1765(1) and (2), there is no indication that Mr. Bias had formed an *1020 opinion in the case or that he was not otherwise impartial. Further, there is no evidence that he lacked any qualification to serve as a juror, as set out in La.Code Crim.P. art. 401.[1] The trial court's belief in Mr. Bias' competence was reasonable, as was its determination that note-taking compensated for Mr. Bias' memory problems. The trial court did not abuse its broad discretion.
Since we have determined that the jury venire was sufficient, it cannot be said to have contributed to the trial court's abuse of discretion here. The Fund's reliance on its successful challenge of Mr. Rogers for cause is unfounded, as the trial court was in a better position to evaluate the respective impediments of Mr. Bias and Mr. Rogers. The trial court noted at bench conference that "I don't feel that Mr. Rogers [as opposed to Mr. Bias] had any options because of his inability to physically sit for that period of time, as well as the medications he was taking." The record of the voir dire as a whole does not reveal an abuse of discretion. Because we do not find that the trial court erroneously denied a challenge for cause, it is of no moment whether the Fund's peremptory challenges were exhausted or whether it was denied a peremptory challenge.

Dr. Brodie's Testimony
The Fund filed a Motion in Limine to prohibit Mrs. Hall from calling ENTs Dr. Brodie and Dr. Horowitz on the grounds that evidence elicited from both would be cumulative and prejudicial. The motion was denied. At trial, Dr. Brodie's video deposition was presented, and he was offered as an ENT expert.
If evidence has a tendency to make the existence of any fact consequential to the determination of the action more or less probable than it would be without the evidence, then such evidence is relevant, and therefore admissible. La.Code Evid. arts. 401 and 402. However, if "unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time" operate to outweigh the probative value of relevant evidence, then the evidence may be excluded. La.Code Evid. art. 403. Moreover, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." La.Code Evid. art. 702.
*1021 The Fund does not object to Dr. Brodie's testimony as a fact witness, but labels his opinion regarding Mrs. Hall's condition as mere speculation, since he had seen her only once. His testimony, according to the Fund, added nothing to that of Dr. Horowitz. The Fund admits that testimony of an ENT specialist is relevant and would assist the trier of fact. It argues, however, that the probative value of the relevant testimony from multiple witnesses in the same specialty is outweighed by substantial prejudice, particularly in light of Dr. Seale's statutory admission of liability. Even if the trial court found that Dr. Brodie's testimony was neither cumulative nor speculative, prejudice to the Fund allegedly arose from the deposition having been taken without the presence of the Fund's counsel and prior to settlement with Dr. Seale, when his liability was in question.
In Frederick v. Woman's Hospital of Acadiana, 626 So.2d 467, 470 (La.App. 3 Cir.1993), writ denied, 93-2991 (La.2/4/94); 633 So.2d 169, we considered the proper level of appellate review in cases where "the trial judge does not make known the basis upon which he or she allows one party to introduce into evidence, over the objections of opposing counsel, the testimony of a significant number of expert witnesses as to one or more identical elements of the case." In this case, however, at the hearing on the motion, the trial court stated:
Well, the Court is not going to limit treating physicians, specifically physicians that have treated in separate time frames, and I don't feel that that would be cumulative. I think if anything, it would be corroborative as to [Mrs. Hall's] situation both prior to earlier treatment or subsequent to earlier treatment and would also go to credibility issues, which is going to be important to the triers of fact. We have a complex medical condition and symptoms that need to be explained here. Under Code of Evidence 401, I feel that it's relevant. I think it will help the triers of fact in determining the total amount of damages, if any, and that the probative value definitely outweighs the prejudicial value [sic], and for those reasons would so rule.
Because the trial court articulated clear reasons upon which his conclusion was based, his determination of credibility and reliability of expert testimony will not be overturned unless it has no reasonable basis and is manifestly erroneous. Id. "[T]he same concerns articulated for giving latitude to trial judges in their factual findings justify leaving largely to their discretion the admission of cumulative evidence." Id. at 472.
As evidenced by the reasons given, the record contains a reasonable factual basis for the trial court's ruling. Dr. Brodie and Dr. Horowitz both treated Mrs. Hall's complex medical condition, both at different times and in different areas of the country (California and Texas, respectively). In Frederick, the court justified the admission of cumulative medical testimony where the two pediatric neurologists attended different medical schools and where one was a hospital administrator while the other was in private practice. Although the testimony of the doctors in Frederick was offered on behalf of different parties, each did, as in this case, offer a "dimensional perspective to the testimony of the other." Id. at 472-473. See also Fowler v. Bossano, 01-357 (La.App. 3 Cir. 10/3/01); 797 So.2d 160 (where one pathologist was allowed to testify in the field of anatomic and clinical pathology, while the other pathologist was allowed to testify in the field of forensic pathology).
*1022 The trial court's ruling is also supported on the grounds of relevance. Each doctor outlined facts of his particular treatment of Mrs. Hall and explained the complexities of her ailments, thereby relating any number of facts relevant to the action, including damages. Their testimony could reasonably have been found to assist the trier of fact.
Similarly the Fund's allegations of unfair prejudice that outweighed the probative worth of the testimony are without merit. Some eight weeks prior to trial, the Halls filed a Motion in Limine indicating their intent to introduce the video deposition of Dr. Brodie at trial and stating that if the Fund wished to call Dr. Brodie live, it could do so at its own expense pursuant to La.Code Civ.P. art. 1450(A)(5).[2] The Fund failed to take advantage of this option, and it did not opt to participate in subsequent depositions and additional cross-examination.
The reasons the trial court did not abuse his much discretion in admitting the testimony of the two doctors are the same reasons that we would assign in satisfaction of the three Frederick criteria,[3] had the trial court not articulated reasons for his credibility and reliability determination. As a final note on this issue, we re-urge our language in Frederick, 626 So.2d at 473, that "[a]s a general rule ... it would be safe to say that a party has a fundamental right to elicit the medical expert testimony of one witness on any point of significance to resolution of the issues presented and probably a second witness as well, for added perspective."

Victim and Third-Party Fault
The Halls argue that the trial court erred in permitting the jury to quantify the fault of Mr. Vines and Mrs. Hall, given that Dr. Seale statutorily admitted liability by settling for $100,000.00. They urge us to reconsider our prior ruling on this issue, wherein we stated:
The trial court erred in striking the relator's allegations of other-party fault. Although "the court shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars," pursuant to La.R.S. 40:1299.44(C)(5), the Louisiana Supreme Court indicated in Graham v. Willis-Knighton Med. Center, 97-188 (La.9/9/97); 699 So.2d 365, that the plaintiff retains the burden of proving that the malpractice at issue caused damages in excess of the $100,000 settlement. *1023 Furthermore, damages must be apportioned between all parties at fault according to La.Civ.Code art. 2323. Thus, given the allegations of potential liability on the part of actors other than the settling defendant, Dr. A. Kent Seale, issues of comparative fault (causation) remain as to damages in excess of $100,000.
Hall v. Brookshire Brothers, Ltd., 01-397 (La.App. 3 Cir. 4/1/01).
Under the provisions of the Louisiana Medical Malpractice Act, the total amount recoverable for all medical malpractice claims is $500,000.00 plus interest and cost, exclusive of future medical care and related benefits. La.R.S. 40:1299.42(B)(1). A patient's recovery from a qualified health care provider is limited to $100,000.00 plus interest. La.R.S. 40:1299.42(B)(2). If a judgment or settlement exceeds the $100,000.00 liability of the health care provider, then the excess is to be paid from the Fund, but not in an amount exceeding $500,000.00. La.R.S. 40:1299.42(B)(3)(a) and (b). If the health care provider or his insurer tenders money in settlement to the patient, and the claimant demands an amount in excess of such settlement from the Fund, then the claimant must adhere to the procedural provisions of La.R.S. 40:1299.44(C). In approving the settlement or in determining the amount to be paid from the Fund, "the court shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars...." La.R.S. 40:1299.44(C)(5).
In Graham v. Willis-Knighton Medical Center, 97-188, p. 15 (La.9/9/97); 699 So.2d 365, 372 (emphasis added), the supreme court interpreted the above statutory provisions as follows:
We now conclude that the legislative intent of "liability" in Section 1299.44 C(5) was that the payment of $100,000 in settlement establishes proof of liability for the malpractice and for damages of at least $100,000 resulting from the malpractice, which is a very significant benefit to the medical malpractice victim. However, at the trial against the Fund, the plaintiff has the burden of proving that the admitted malpractice caused damages in excess of $100,000.

Relying on Graham, the court in Gravley v. Giambelluca, 98-713, p. 2 (La.App. 4 Cir. 5/5/98); 758 So.2d 160, 161, recognized that "the PCF is entitled to assert comparative fault of plaintiffs and others so that the jury can apportion the damages at trial" following the plaintiffs' $100,000.00 settlement with a qualified health care provider. More recently, in the per curiam opinion of Conner v. Stelly, 02-280 (La.1/30/02); 807 So.2d 827 (emphasis added), the supreme court stated the following regarding the quantification of victim and third-party fault in medical malpractice actions:
Although payment of $100,000 in settlement establishes proof of liability for the malpractice and for damages of at least $100,000 resulting from the malpractice, at the trial against the Fund, the plaintiff has the burden of proving that the admitted malpractice caused damages in excess of $100,000. Graham v. Willis-Knighton Med. Ctr., 97-0188 (La.9/9/97), 699 So.2d 365. Accordingly, that portion of the trial court's judgment prohibiting the PCF from arguing or presenting evidence before the jury that victim or third-party fault caused any of the damages in this case is reversed.

See also Ceasar v. Barry, 02-52 (La.App. 3 Cir. 7/17/02); 823 So.2d 998, in which we held that the plaintiffs were not entitled to summary judgment as to the sole liability of the settling physician, where they were *1024 still pursuing a malpractice claim against another defendant (a hospital). In light of the jurisprudence following Graham, 699 So.2d 365, we find that the trial court properly permitted the jury to quantify the fault of Mr. Vines and Mrs. Hall.

Exclusion of Dr. Fann's Testimony
Plaintiffs moved to prohibit the testimony of defense expert, Dr. William Fann, a pharmacologist. A Daubert hearing was held during the trial, after it was revealed that the doctor had never treated Mrs. Hall and was therefore limited to her medical records. Ultimately, the trial court decided that Dr. Fann's testimony, although relevant, would have greater prejudice than probative value, since it went to the ultimate issues of causation and fault, yet it would be limited to a pharmaceutical analysis of the effects of Gentamicin on the average person.
The Fund argues that the ultimate issue in this case concerns the allocation of fault among Dr. Seale, Mr. Vines, and Brookshire, as well as the causation of damages in excess of $100,000.00. Accordingly, Dr. Fann's testimony should not have been stricken simply because it "incriminated" the pharmaceutical parties and cast doubt upon Dr. Seale's admission of malpractice.
The trial court is allowed much discretion in determining whether to allow a witness to testify as an expert under La.Code Evid. art. 702. Its judgment will remain undisturbed unless clearly erroneous. Abshire v. Wilkenson, 01-75 (La. App. 3 Cir. 5/30/01); 787 So.2d 1158. Considering this broad discretion, we do not find error with the trial court's balancing test under La.Code Evid. arts. 401 and 403, and we agree in result.
Dr. Fann's testimony could not assist the trier of fact in determining damages to the inner ear. His expertise was pharmacology, not otolaryngology, and he admitted that vestibular function in the ear was not his area of expertise. Although he never examined Mrs. Hall, Dr. Fann opined that if she had stopped taking the drug while she was asymptomatic and in accordance with Dr. Seale's orders, it was within a reasonable medical probability that she would not have suffered the subsequent damage. However, this opinion was based upon discussions with two colleagues in other medical fields rather than on his own expertise. He could not cite any authoritative source for this opinion, and he had never treated anyone who had vestibular dysfunction due to Gentamicin ototoxicity. We find no error in the trial court's decision to exclude Dr. Fann's testimony.

Mrs. Hall's Testimony as to Dr. Seale's Treatment
On direct examination, Mrs. Hall was questioned as to "what really happened." Counsel for the Fund objected to relevancy, as the parties had admitted Dr. Seale's liability. The trial court overruled the objection.
The Fund argues that, as a result of this evidentiary ruling, Mrs. Hall was allowed to testify as to the "bad acts" of Dr. Seale, even though his liability was admitted. The Fund further argues that the prejudicial nature of her testimony was compounded by the exclusion of Dr. Fann's testimony, which would have countered Mrs. Hall's testimony.
The Halls direct attention to the writ application taken by the Fund, in which this court determined that issue of comparative fault remained in this case. They argue that, in light of our writ, it would have been foolish for Mrs. Hall not to have addressed comparative fault.
Mrs. Hall's testimony regarding her treatment by Dr. Seale was in keeping *1025 with our writ determination, since the Fund admitted that it was pursuing victim fault. Evidence of Dr. Seale's instructions to Mrs. Hall, her understanding thereof, the chronology of events, and the general facts surrounding her treatment were relevant. Had Dr. Fann been allowed to testify, he would not have countered Mrs. Hall's testimony, since his expertise would have been limited to the pharmacological effects of Gentamicin. The trial court's decision to allow such testimony was not erroneous.

The Jury's Allocation of Fault
The Halls and the Fund object to the jury's allocation of 10% fault to Mr. Vines and 5% fault to Mrs. Hall. The Halls argue that the Fund failed to prove that actions of Mr. Vines or Mrs. Hall caused any of her damages, while the Fund contends that a greater percentage of fault should have been assessed to those actors.
The trier of fact's apportionment of fault is a factual determination subject to the manifest error standard of review. Clement v. Frey, 95-1119 (La.1/16/96); 666 So.2d 607. In Watson v. State Farm Fire & Casualty Insurance Co., 469 So.2d 967 (La.1985), the supreme court listed the following factors to be considered in assessing the conduct of all parties: (1) whether the conduct resulted from inadvertence or from an awareness of danger; (2) the magnitude of the risk created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances that might have required the actor to proceed in haste without proper thought.
The jury's verdict reflects a finding that the greater part of Mrs. Hall's damages was caused by Dr. Seale's improper prescription of Gentamicin. This finding is amply supported by the record. Dr. Horowitz testified that Gentamicin is a powerful antibiotic usually used with other drugs to treat life-threatening infections, whereas penicillin is more commonly used to treat a staphlococcus infection such as the one that caused Mrs. Hall's boils. According to Dr. Horowitz, Gentamicin is generally not prescribed in a single "bolus" dose of 240mg, as Dr. Seale ordered, but should be taken every eight hours to avoid high levels of the drug in the blood stream. Dr. Horowitz further testified that, if Gentamicin is to be used in long-term home therapy, it should be administered and monitored by a home health nurse. Additionally, Dr. Seale issued the full twenty-one day prescription from his office after the catheter had been inserted in the hospital, even though two doses had already been administered. Under the factors in Watson, Dr. Seale was clearly the superior actor who should have appreciated the great risk caused by his conduct.
Nonetheless, Dr. Seale was not the only actor whose conduct contributed the harm. Mr. Vines' dispensing of additional doses clearly fell below the standard of care, and the trial court granted the Fund's partial motion for summary judgment as to his liability. However, while Mr. Vines' conduct allowed Mrs. Hall to take the drug for an excessive number of days, Mrs. Hall was aware that her prescription was for only twenty-one days. Mrs. Hall also waited several days before reporting her symptoms, despite warnings by a family friend that she should see a doctor, and she missed some appointments for follow-up care. We find no error in the jury's allocation of fault.

Damages in Excess of $100,000.00
"[T]he role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the *1026 exercise of the discretion by the trier of fact.... [T]he adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). If there is no clear abuse of discretion, then reference to other awards in similar cases is inappropriate. Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976). In light of these standards, we find that the jury's award of general damages in the amount of $1,500,000.00 was not excessive.
Dr. Brodie explained that there is no treatment to rectify Mrs. Hall's bilateral vestibular injuries. Both Dr. Brodie and Dr. Horowitz testified that her injuries, which are irreversible, significantly compromise her mobility and stability. Dr. Horowitz explained that Mrs. Hall presents a danger to herself daily if left alone. She has a propensity to fall when performing simple tasks, such as bending over to retrieve an object or taking a shower. She will have chronic problems with dizziness, vertigo, and nausea, and her ability to ambulate is highly dependent upon her ability to see. As she ages, her sight will be compromised, as will her general balance and equilibrium.
Her disabilities have hampered her ability to travel with her husband and to spend quality time with her two children and four granddaughters, as she once did. Mr. Hall testified to his wife's present physical and emotional turmoil. Their home has been modified to accommodate her needs, and Mr. Hall must be constantly accessible to her, thereby limiting his own independence. Her son testified to his mother's transition from healthy to disabled, and how she is no longer able to cook and enjoy family outings without assistance. Similarly, her daughter explained how her mother, who once catered to her family, must now rely on them for assistance.
Clinical neuropsychologist Dr. Lawrence Dilks testified that Mrs. Hall suffered from significant emotional problems, such as anger, depression, animosity, agitation, and sexual dysfunction. Because of Mrs. Hall's significant and permanent handicap, Dr. Dilks recommended that a personal care attendant be present for eighteen hours a day (up from the initial recommendation of twelve hours). Mrs. Hall has to rely on her husband for the remaining six hours. Considering the foregoing, neither Mrs. Hall's award for general damages nor Mr. Hall's $200,000.00 award for loss of consortium represent an abuse of discretion. We, therefore, refrain from reference to awards granted in similar cases.
Damages for loss of earning capacity and for past and future medical expenses are special damages. They can be established to a reasonable mathematical certainty or with relative certainty. Wainwright v. Fontenot, 00-492 (La.10/17/00); 774 So.2d 70; Whitehead v. Kansas City S. Ry. Co. 99-896 (La.App. 3 Cir. 12/22/99); 758 So.2d 211, writ denied, 00-0209 (La.4/7/00); 759 So.2d 767. "The discretion afforded the trier of fact to assess special damages is narrower or more limited than the discretion to assess general damages." Eddy v. Litton, 586 So.2d 670, 675 (La.App. 2d Cir.1991), writ denied, 590 So.2d 1203 (La.1992). Such damages are, however, still subject to the abuse of discretion standard of review. Wainwright, 774 So.2d 70. After a thorough review of the record, we conclude that Mrs. Hall's special damages were justified.
With respect to Mrs. Hall's $146,834.00 award for loss of earning capacity, the Fund claims that there was no *1027 testimony that Mrs. Hall planned on returning to work at any point. However, as the supreme court stated in Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979):
Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.
Dr. Horowitz testified that Mrs. Hall is totally and permanently disabled from employment. She has significant difficulty in walking because of her propensity to fall, she cannot drive, and she suffers from severe nausea and dizziness. Glenn Hebert, a vocational rehabilitation counselor, testified that prior to the onset of her disability at fifty-three years of age, Mrs. Hall was capable of returning to work as an office clerk, secretary, bank teller, or salesperson. At the time of the incident, those positions paid from $15,000.00 to $18,000.00 per year.
Mr. Hebert also met with Mrs. Hall and her treating physicians. After reviewing her medical records, he prepared a particularized Life Care Plan. The Plan calculated the low present and high present values of the following: projected evaluations, projected therapies, diagnostic testing, wheelchair needs, future medical care, medications, home care, and home renovations. The value of Mrs. Hall's future life care ranged from $2,860,763.00 to $3,716,001.00. Both Dr. Horowitz and Dr. Dilks agreed with Mr. Hebert's plan. The Fund failed to offer any substantive evidence to contradict the testimony of Drs. Horowitz and Dilks or Mr. Hebert. Insofar as the Fund relies on Dr. Fann to rebut the amount of damages, such reliance is unfounded, as is discussed in greater detail above.

Computation of Damages
The Halls and the Fund argue that the trial court erred in its application of the percentages of fault assessed to the damages awarded. The Fund contends that the trial court should have applied the 15% reduction for the fault of Mr. Vines and Mrs. Hall after the award was reduced to the $500,000.00 cap of La.R.S. 40:1299.42(B)(1). The Halls argue that the trial court should not have reduced Mrs. Hall's award for past medical expenses.
The jury awarded $1,000,000.00 for physical and mental pain and suffering and loss of enjoyment of life (past and future); $500,000.00 for permanent or partial physical disability (past and future); $146,834.00 for loss of earning capacity; and $35,251.43 for past medical expenses. The jury also found that Mrs. Hall was in need of future medical care in the amount of $3,862,835.00, and Mr. Hall was awarded $200,000.00 for his loss of consortium.
When a dispute arose with respect to the application of the fault percentages, the trial court conducted a hearing to reconcile the judgment. The trial court reduced the total amounts awarded by the jury for pain and suffering, loss of enjoyment of life, disability, consortium, and loss of earning capacity by 15%, reflecting the apportioned fault of Mrs. Hall and Mr. Vines. Because the remaining amount of damages exceeded the statutory cap, the trial court reduced it to $400,000.00 (which reflected a $100,000.00 credit for the settlement of Dr. Seale). The trial court then reduced the award for past medical expenses by 15% and added that amount to the $400,000.00. With regard to the award for future medical care, the trial court likewise subjected it to a comparative fault reduction. Because these benefits *1028 are not recoverable until they are accrued, however, the trial court did not award interest thereon. The resulting judgment was for the full sum of $429,963.72, with legal interest thereon from May 31, 1996 until paid. It also declared Mrs. Hall to be a patient in need of future medical care and related benefits. The judgment did not include interest on the $100,000.00 received in settlement.
"The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost." La.R.S. 40:1299.42(B)(1). This $500,000.00 cap is subject to a $100,000.00 previously paid settlement credit. La.R.S. 40:1299.42(D).
La.Civ.Code art. 2323 (emphasis added) provides:
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.
C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.
The Fund argues that the use of the term "damages recoverable" in Article 2323 mandates that the percentages of fault assigned to Mrs. Hall and Mr. Vines be applied to the damage award after its reduction to $500,000.00 because that amount is the Plaintiffs' only "damages recoverable" under La.R.S. 40:1299.42(B)(1). We disagree. The second sentence of paragraph A provides that "damages recoverable" shall be reduced only by the percentage of negligence of the plaintiff ("the person suffering the injury, death, or loss"), yet the Fund argues we should reduce the "damages recoverable" of $400,000.00 by the fault assessed to both Mrs. Hall and Mr. Vines. This inconsistency illustrates the fallacy in the Fund's argument. We find that, as used in Article 2324, the term "damages recoverable" is to be applied in the context of the reduction of damages by the fault of all tortfeasors, and not in the context of the medical malpractice act. The Fund argues that the trial court judgment deprives it of the benefit of the fault assigned to Mrs. Hall and Mr. Vines, but this is so only because the amount of damages in this case exceeds the statutory limit, just as some plaintiffs do not receive the full benefit of their damage award because of the cap. We find no error in the trial court's application of the percentages of fault.
The Halls' argument that past medical expenses should not have been reduced is based upon their contention that third-party *1029 and victim fault were not issues in this case. Having previously rejected this argument, we find no error in the reduction of past medical expenses by the percentages of fault assigned to Mrs. Hall and Mr. Vines.
In recapping the trial court's judgment, we note the following: Mrs. Hall's physical and mental pain and suffering and loss of enjoyment of life, permanent or partial physical disability, and loss of earning capacity add up to $1,646,834.00. Because that amount exceeds the statutory cap, it is reduced to $500,000.00, subject to the $100,000.00 settlement credit. For the purposes of La. R.S. 40:1299.43, "`future medical care and related benefits'... means all reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services, after the date of injury." La.R.S. 40:1299.43(B)(1) (emphasis added). As the supreme court explained in Kelty v. Brumfield, 93-1142, p. 10 (La.2/25/94); 633 So.2d 1210, 1217, this provision "comprehends all past, present, and future medical and related care services necessitated by a qualified health care provider's malpracticenot just what is usually thought of as `future' medical needs." See also LaMark v. NME Hosps., 522 So.2d 634, 639 (La.App. 4 Cir.), writ denied, 526 So.2d 803 (La.1988) ("`future medical care and related benefits' as used in R.S. 40:1299.43, includes all reasonable medical expenses incurred from the date of the alleged malpractice"). Therefore, Mrs. Hall's award for past medical expenses of $35,251.43, after a reduction to $29,963.72 for the allocation of fault, is added to the $400,000.00 figure owed by the Fund. Mrs. Hall was also found to be in need of future medical care in the amount of $3,862,835.00. According to La.R.S. 40:1299.43(C), "the patient may make a claim to the patient's compensation fund through the board for all future medical care and related benefits directly or indirectly made necessary by the health care provider's malpractice...." Such payments are to be made by the Fund without regard to the $500,000.00 statutory cap. La.R.S. 40:1299.43(D).
The malpractice cap is administered per patient, rather than per plaintiff. See Hollingsworth v. Bowers, 96-257 (La. App. 3 Cir. 12/30/96); 690 So.2d 825. Because Mrs. Hall's award has exhausted her per patient limit, Mr. Hall's award for loss of consortium is extinguished.

Judicial Interest
The jury's verdict reflected $5,744,920.43 in total damages. The Halls contend that the Fund owes legal interest on this entire award and that such interest accrues from the date of filing with the Board. The Fund contends that the statute makes the health care provider liable for interest on the $100,000.00 paid in settlement and that Halls' acceptance thereof effectively waives their right to recover any legal interest on those proceeds. Moreover, if the statutory cap alleviates the Fund from liability in an amount greater than $500,000.00 (subject to the $100,000.00 settlement credit) plus interest and cost, exclusive of future medical care and related benefits, the Fund argues that it should not be liable for interest on the entire quantum. We agree.
"Legal interest shall accrue from the date of filing of the complaint with the board on a judgment rendered by a court in a suit for medical malpractice brought after compliance with this Part." La.R.S. 40:1299.47(M). The total amount recoverable for all malpractice claims, exclusive of future medical care and related benefits, cannot exceed $500,000.00 plus interest *1030 and cost. La.R.S. 40:1299.42(B)(1). The Halls have proven their entitlement to the full $500,000.00, exclusive of future medical care and related benefits. However, while the statute allows interest on the $500,000.00 maximum award, it does not authorize recovery of interest on the amounts exceeding that cap. See Allen v. State, 535 So.2d 903 (La.App. 2 Cir.), writ denied, 536 So.2d 1201 (La.1988) (addressing interest on damages in excess of the statutory cap).
The Fund is entitled to a credit for the sums tendered in settlement by the health care provider. La.R.S. 40:1299.42(D)(5). Therefore, the Fund is at least liable for interest on $400,000.00 of the total award. The Fund is not liable, however, for interest on the $100,000.00 tendered in settlement. Interest thereon is the responsibility of the health care provider, since La. R.S. 40:1299.42(B)(2) clearly says that "[a] health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon ...." (Emphasis added.) This is consistent with our holding in Futch v. Attwood, 97-259, p. 12 (La.App. 3 Cir. 6/18/97); 698 So.2d 958, 964, writ granted, 97-2664 (La.2/6/98); 709 So.2d 721, where "[w]e [did] not find that the amending language in (B)(2) was intended to have legal interest continue to accrue on sums that have already been paid." We went on to underscore the precept that "legal interest is intended to compensate ultimately victorious litigants for the time value (interest) of money of which they have been deprived, and the need for such equitable relief vanishes upon the unconditional tender of such funds." Id. Other circuits have ruled similarly. To find otherwise would amount to unjust enrichment.
We have said earlier that for the purposes of La.R.S. 40:1299.43, future medical care and related benefits "comprehends all past, present, and future medical and related care services necessitated by a qualified health care provider's malpractice...." Kelty, 633 So.2d at 1217. Therefore, Mrs. Hall's award for past medical expenses as well as her award for future medical care are both considered "future medical care and related benefits." Interest on future medical benefits is payable "from the date of the filing of the complaint or the date the expenses were incurred, whichever is later." Kelty v. Brumfield, 96-869, p. 8 (La.App. 4 Cir. 3/12/97); So.2d 242, 247-248, writ denied, 97-918 (La.5/16/97); 693 So.2d 800. Since the $35,251.43 award for past medical expenses, which was reduced to $29,963.72, represents expenses that have already been incurred, interest is owed thereon. However, the $3,862,835.00 award for future medical care, also subject to a reduction for the allocation of fault, represents expenses that have not yet been incurred. It would be improper to award pre-judgment interest on sums not yet owed.

Frivolous Appeal
The Halls claim that the Fund's appeal was frivolous. "Damages for frivolous appeal [as authorized by La. Code Civ.P. art. 2164] are only allowed when `it is obvious that the appeal was taken solely for delay or that counsel is not sincere in the view of the law he advocates even though the court is of the opinion that such view is not meritorious.' Parker v. Interstate Life & Accident Ins. Co., 248 La. 449, 179 So.2d 634, 636 (1965)." Fowler, 797 So.2d at 170 (quoting Hampton v. Greenfield, 618 So.2d 859, 862 (La.1993)). While some of the Fund's issues for review may be substantively tenuous, there is no evidence that the appeal was taken for delay or that counsel was insincere. To the contrary, as evidenced by the foregoing, *1031 this case contains novel legal questions concerning the admission and establishment of a health care provider's liability under La.R.S. 40:1299.44(C)(5) and how that affects causation and allocation of fault. If there were no basis for appeal in this case, the Halls themselves would not have felt compelled, as they did, to assign issues for review.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed in its entirety. Costs of this appeal are assessed one-third to the Halls and two-thirds to the Fund.
AFFIRMED.
THIBODEAUX, J., dissents in part and assigns written reasons.
THIBODEAUX, J., dissenting in part.
Article 2323 of the Civil Code does not justify the imposition of victim and third-party fault under the Medical Malpractice Act when the sole remaining medical provider has admitted liability by the payment of $100,000 to the injured patient. I, therefore, dissent from the majority opinion which permits the quantification of victim and third-party fault under the circumstances of this case.
My reasons for disagreeing with my colleagues begin with a brief analysis of some elementary principles of tort liability essential to resolve questions of causation and fault that exist in this case.
Negligence"fault" under Civil Code Article 2315is the failure to exercise reasonable care under the circumstances.
* * *
Much of the difficulty surrounding negligence arises out of the inconsistent use of terms. Even the word "negligence" itself is susceptible to varying definitions. Technically, one is negligent when all four elementsduty, breach, causation and damagesare present. Frequently, however, the term "negligence" is used to describe careless conduct (duty and breach); thus, it sometimes is said that a defendant, although negligent, is not liable, because either causation or damages is lacking. Properly speaking, if the defendant is not liable to the plaintiff in a particular case, he is not negligent because the plaintiff has not established all the elements of negligence.
Frank L. Maraist and Thomas C. Galligan, Louisiana Tort Law 75-76 (1996)
Regardless of the way the word "negligence" is used (i.e., denoting either all four elements of tort or simply duty and breach), it is enough to say that "liability" is comprised of duty, breach, causation, and damages. One cannot be liable, therefore, without being negligent, since the presence of negligence is necessary to achieve liability. And since "negligence" is synonymous with "fault," then by extension, one cannot be liable without being at fault. Applying these principles to the clear language of La. R.S. 40:1299.44(C)(5), I can come to no other conclusion than that when Dr. Seale admitted and established his "liability" via the $100,000 settlement, he necessarily and conclusively admitted both his entire fault for all resultant damages as well as the causal connection between said fault and all resultant damages (up to the $500,000 statutory cap, exclusive of future medical care and related benefits). To concede otherwise is adverse to the fundamental principles of "tort liability [which] encompasses both fault and causation.... Fault and causation as elements of liability are too closely interrelated to be tried separately...." Brown v. New Orleans Pub. *1032 Serv., Inc., 506 So.2d 621, 624 (La.App. 4 Cir.), writ denied, 508 So.2d 67 (La. 1987); Pendleton v. Barrett, 95-2066, p. 15 (La.5/31/96); 675 So.2d 720, 728.
In 1997, the Louisiana Supreme Court concluded
that the legislative intent of "liability" in Section 1299.44 C(5) was that the payment of $100,000 in settlement establishes proof of liability for the malpractice and for damages of at least $100,000 resulting from the malpractice, which is a very significant benefit to the medical malpractice victim. However, at the trial against the Fund, the plaintiff has the burden of proving that the admitted malpractice caused damages in excess of $100,000.
Graham v. Willis-Knighton Med. Ctr., 97-0188, p. 15 (La.9/9/97); 699 So.2d 365, 372. Considering that an admission of "liability" includes an admission of causation, I interpret the words of Graham not as requiring the plaintiff to prove a causal connection between the admitted malpractice and damages in excess of $100,000. Rather, I believe that Graham places a burden on the plaintiff to demonstrate the amount in excess of $100,000 that was caused by the admitted malpractice. This interpretation is further supported by our circuit's interpretation of Graham in Judalet v. Kusalavage, 2000-59, p. 7 (La.App. 3 Cir. 6/21/00); 762 So.2d 1128, 1132, writ denied, 2000-2240 (La.10/27/00); 772 So.2d 653:

Graham simply initiated the principle that once a defendant's liability is established, the plaintiff is not additionally obligated to prove causation. The only remaining issue for plaintiff to verify is the amount of damages sustained by the victim which was consequential to the defendant's admitted malpractice. An elementary principle of tort provides that cause-in-fact is a part of the liability equation. The $100,000 settlement made by Dr. Kusalavage to the Judalets alleviated their duty of "proving (1) the standard of care and (2) a breach by the health care provider." McPherson [v. Lake Area Med. Ctr., 99-977, p. 5 (La. App. 3 Cir. 12/29/99); 755 So.2d 972, 975] (quoting Greer v. LAMMICO, 29,066, p. 8 (La.App. 2 Cir. 4/13/98); 712 So.2d 598, 602).
Liability encompasses causation. If the court in Graham intended for its interpretation of La.R.S. 40:1299.44(C)(5) to derogate from well-founded principles of tort liability by separating out the causal element from the traditional notion of "liability," then it would have done so expressly. I do not believe that such was its intention.

Interplay of La.R.S. 40:1299.44(C)(5) and La.Civ.Code art. 2323
Paragraph A of La.Civ.Code art. 2323 explains that in an action for damages where a person suffers injury, the percentage of fault of all persons causing or contributing to the injury must be determined, regardless of party status, insolvency, ability to pay, immunity by statute, or ability to be identified. Moreover, if the injury is a result of the person's own negligence and partly of another person or persons, the amount recoverable is proportionately reduced. Paragraph B mandates that "[t]he provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability."
The jury allocation of 85% of the fault to Dr. Seale, 10% to Mr. Vines, and 5% to Mrs. Hall was erroneous and allowed consideration of the fault of actors other than Dr. Seale. However, I have already said that the tender of $100,000 in settlement establishes "liability" under La.R.S. 40:1299.44(C)(5) and amounts to a complete admission of fault. As such, there is *1033 no fault to compare under Article 2323 in this case, rendering Paragraph B's mandate inapplicable to the present facts. I recognize the legitimate argument that when Dr. Seale admitted fault, he did not admit to any specific percentage of fault. However, upon closer inspection, I now fail to see how he can be 100% at fault for the first $100,000 of the damage, but somehow less than 100% at fault for the remainder of the damage. It seems contrary to Article 2323 to allocate different percentages of fault to two arbitrarily divided parts of the same injury. Paragraph A clearly describes allocation of responsibility for "the injury," not "part of the injury."
I am fully cognizant of Conner v. Stelly, 2002-02 (La.1/30/02); 807 So.2d 827, the recent per curiam Louisiana Supreme Court decision, which reads in full:
Granted in part. Although payment of $100,000 in settlement establishes proof of liability for the malpractice and for damages of at least $100,000 resulting from the malpractice, at the trial against the Fund, the plaintiff has the burden of proving that the admitted malpractice caused damages in excess of $100,000. Graham v. Willis-Knighton Med. Ctr., 97-0188 (La.9/9/97), 699 So.2d 365. Accordingly, that portion of the trial court's judgment prohibiting the PCF from arguing or presenting evidence before the jury that victim or third-party fault caused any of the damages in this case is reversed. In all other respects, the application is denied. Case remanded to the trial court for further proceedings.
In Ecroyd v. Ecroyd, 96-436, p. 16 (La. App. 3 Cir. 10/9/96); 682 So.2d 788, 797, writ granted, 96-3058 (La.12/19/97); 706 So.2d 440, on remand, 96-436 (La.App. 3 Cir. 5/6/98); 713 So.2d 638, when a party relied upon a supreme court per curiam opinion, we said that "[b]ecause the facts underlying that decision were not reported by either the appellate court or the supreme court, we find the per curiam opinion to be of little precedential value." Similarly, in Citgo Petroleum Corp. v. Yeargin, Inc., 95-1574, p. 10 (La.App. 3 Cir. 7/3/96); 678 So.2d 936, 941, writs granted, 96-2000, 96-2007 (La.11/15/96); 682 So.2d 746, 747, on remand, 95-1574 (La.App. 3 Cir. 2/19/97); 690 So.2d 154, we cited a single paragraph supreme court per curiam opinion and then explained that "[w]ithout the benefit of further reasoning, we cannot discern what facts prompted the supreme court to reverse the first circuit and reinstate the trial court's award of attorney fees or upon which law the reversal was based." The statements from these two cases are significant, primarily because there is no other reported supreme or appellate court decision in the case of Conner v. Stelly. Without accompanying facts or reasoning to support the per curiam holding, I choose not to regard it as authoritative.
For the foregoing reasons, I respectfully dissent in part.
NOTES
[1] La.Code Crim.P. art. 401:

A. In order to qualify to serve as a juror, a person must:
(1) Be a citizen of the United States and of this state who has resided within the parish in which he is to serve as a juror for at least one year immediately preceding his jury service.
(2) Be at least eighteen years of age.
(3) Be able to read, write, and speak the English language and be possessed of sufficient knowledge of the English language.
(4) Not be under interdiction or incapable of serving as a juror because of a mental or physical infirmity, provided that no person shall be deemed incompetent solely because of the loss of hearing in any degree.
(5) Not be under indictment for a felony nor have been convicted of a felony for which he has not been pardoned.
B. Notwithstanding any provision in Subsection A, a person may be challenged for cause on one or more of the following:
(1) A loss of hearing or the existence of any other incapacity which satisfies the court that the challenged person is incapable of performing the duties of a juror in the particular action without prejudice to the substantial rights of the challenging party.
(2) When reasonable doubt exists as to the competency of the prospective juror to serve as provided for in Code of Criminal Procedure Art. 787.
[2] La.Code Civ.P. art. 1450(A)(5) provides:

However, any party may use the deposition of an expert witness for any purpose upon notice to all counsel of record, any one of whom shall have the right within ten days to object to the deposition, thereby requiring the live testimony of an expert. The objecting counsel of record shall pay in advance the fee, reasonable expenses, and actual costs of such expert witness associated with such live testimony. The fees, expenses, and costs specified in this Subparagraph shall be subject to the approval of the court. The provisions of this Subparagraph do not supersede Subparagraph (A)(3) nor Code of Evidence Article 804(A). However, the court may permit the use of the expert's deposition, notwithstanding the objection of counsel to the use of that deposition, if the court finds that, under the circumstances, justice so requires.
[3] "Admitting cumulative expert testimony not excludable on other grounds requires its fulfilling three conditions. The first condition questions the relevance of the testimony to be elicited. The second seeks to ascertain that the fact finder will be aided by the testimony. The third, balancing the probative value of this testimony against substantial prejudice, confusion, or inefficiency, guards against undue removal of reason from the fact finding process, as well as waste. Want of any of the three is fatal to admission of an expert's unbridled testimony." Frederick, 626 So.2d at 471.